UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

KASIB AHMAD HOWARD,

          Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

**DECISION AND ORDER**

6:15-CV-06103 EAW

_____

## I.    Introduction

Plaintiff Kasib Ahmad Howard ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and seeks review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying Plaintiff's application for disability benefits. (Dkt. 1). Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") David J. Begley is not supported by substantial evidence and is contrary to law and regulation. (Dkt. 1).

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Fed. R. Civ. P. Rule 12(c). (Dkt. 13; Dkt. 16). For the reasons set forth below, this Court finds that the decision of the Commissioner is not supported by substantial evidence in the record and is not in accordance with the applicable legal standards. Thus, Plaintiff's motion for judgment on the pleadings (Dkt. 13) is granted, in part, and the Commissioner's motion for judgment on the pleadings (Dkt. 16) is denied.

II.     **Factual Background and Procedural History**

A.      **Overview**

On June 13, 2012, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 129-34, 142). Plaintiff alleged a disability onset date of August 1, 2011. (Tr. 142). In his application, Plaintiff alleged the following disabilities: a learning disability, leg problems, vision problems — legally blind in right eye, anxiety, depression, foot problems, and attention deficit disorder. (Tr. 146). The Commissioner denied Plaintiff's application on October 24, 2012 (Tr. 72-83), and Plaintiff requested a hearing by an ALJ on November 9, 2012. (Tr. 90-92). On September 11, 2013, Plaintiff, represented by counsel, testified at a hearing in Falls Church, Virginia, via video teleconference from Rochester, New York before ALJ David J. Begley. (Tr. 25-53). On November 8, 2013, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 13-21).

Plaintiff requested review of that decision (Tr. 7-9) and on February 12, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). On February 26, 2015, Plaintiff filed this action appealing the final decision of the Commissioner. (Dkt. 1).

B.      **The Non-Medical Evidence**

1.      **General**

Plaintiff was born on September 11, 1984 and, at the time of Plaintiff's hearing, he was 29 years old. (Tr. 31). He has both a high school education and attended special education classes. (Tr. 147). He also earned an associate degree in hospitality

management.  (Tr. 33).  He had no past relevant work, but additional past work titles included food server, laborer, and sergeant at arms.  (Tr. 67).  Plaintiff stated that he lives alone in an apartment on the second floor, accessible by stairs with a rail.  (Tr. 32).

### 2.      Plaintiff's Testimony

At his administrative hearing, Plaintiff testified that he could not work because of his vision problems and light sensitivity.  (Tr. 32).  He stated he could not see anything out of his right eye, referring to the retinal detachment, and used his left eye to read, but he needed to take breaks frequently.  (Tr. 44-45).  At the time of the hearing, Plaintiff testified that he went to school Monday through Friday to study office technology.  (Tr. 37).  Plaintiff further testified that he received services from his college's Students with Disabilities Office, such as extra time to complete tests, and enlarged print on handouts.  (Tr. 45).  Plaintiff testified that he has trouble concentrating on things, that it is difficult for him to comprehend things, and that his mind wanders.  (Tr. 46). Plaintiff also stated he could use a computer at school.  (Tr. 38).

Plaintiff testified that he did his own laundry at his father's house, and could make simple meals like sandwiches, cereal, and oatmeal.  (Tr. 38).  He also stated that he did not own a stove, and ate out frequently.  (Tr. 38).  He stated he could care for his own personal grooming.   (Tr. 38).   Plaintiff testified that his cousin helped him with household chores such as cleaning.  (Tr. 37).

### 3.      Vocational Expert's Testimony

Cyndee Burnett, a vocational expert ("VE"), also testified at the hearing.  (Tr. 49-52).  The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age,

education, and no past relevant work history, who could perform the full range of light work, but could not climb ladders, ropes, or scaffolds, could only occasionally climb ramps and stairs and balance, stoop, kneel, crouch, and crawl, and would need to avoid slippery and uneven surfaces, hazardous machinery, and unprotected heights. (Tr. 50-51). The ALJ further specified that the individual would be limited to doing simple, routine, repetitive tasks, and would be limited to jobs that did not require peripheral acuity or working with small objects, small print, or fine visual acuity. (Tr. 51). The VE testified that such a person could perform jobs available in significant numbers in the national economy, such as housekeeper, laundry worker, and cafeteria worker. (Tr. 51).

### C.    Summary of the Medical Evidence

Plaintiff has a history of leg pain resulting from a fracture of his left femur that occurred when he was a teenager. (Tr. 232). He underwent an open reduction internal fixation. (Tr. 232). Plaintiff was treated by Dr. Carolyn Mok, M.D., on January 14, 2010 and August 24, 2010. During the August 24, 2010 visit, Dr. Mok noted that Plaintiff was able to walk and stand. (Tr. 250). Plaintiff also has a history of vision problems, including retinal detachment of the right eye status post laser treatment in 1998. (Tr. 221). Plaintiff is blind in his right eye. (Tr. 246, 250).

In addition, Plaintiff has a history of depression and a learning disability. As a child, Plaintiff had academic and behavioral difficulties with defiant and aggressive behavior that resulted in several suspensions from school. (Tr. 200). On May 1, 1996, Robert Zlotek, a school psychologist, performed an intellectual evaluation of Plaintiff when Plaintiff was eleven years old. (Tr. 200-201). On the Wechsler Intelligence Scale

for Children-III, Plaintiff obtained a full scale IQ score of 83, a verbal IQ score of 85, and a performance IQ score of 83.  (Tr. 200).  The testing indicated visual-motor integration deficits.  (Tr. 201).  Plaintiff admitted that he felt unable to control his actions and his poor self-control and aggressive behavior led to his suspensions.  (Tr. 201).  School psychologist Zlotek found that Plaintiff functioned in the low average range and that his basic learning skills ranged from average to low.  (Tr. 198; Tr. 200).  A review by the school psychologist, a learning consultant, and a social worker showed Plaintiff exhibited "seriously disordered behavior over an extended period of time which adversely affects his educational performance."  (Tr. 199).  These evaluators determined that Plaintiff was eligible to receive services as an emotionally disturbed student.  (Tr. 199).  Plaintiff received counseling in relation to his placement as a student with "unique educational needs."  (Tr. 180-181).  On May 30, 1996, Edward Tabbanor, M.D., a psychiatrist, performed a psychiatric evaluation resulting from Plaintiff's obstreperous behavior that had led to multiple suspensions with a pattern of disrespect to authority and disruptive classroom behavior.  (Tr. 208).  Dr. Tabbanor found that Plaintiff had a depressed mood with some detachment and defensiveness.  (Tr. 208). Dr. Tabbanor diagnosed Plaintiff with "conduct disorder, unsocialized aggressive type with depression."  (Tr. 208).  Dr. Tabbanor noted in his recommendation that Plaintiff was a candidate for class placement for the emotionally handicapped.  (Tr. 209).

An eligibility statement from the Irving Department of Special Services also indicated Plaintiff's basic learning skills ranged from average to low.  (Tr. 198).  It was also noted that Plaintiff had much difficulty conforming to school rules, had poor self-

control, and aggressive behavior.  (Tr. 198).  He was diagnosed with conduct disorder, unsocialized aggressive type with depression.  (Tr. 199).  An individualized education program statement dated November 7, 1998 noted that Plaintiff was eligible for special educational services because he had exhibited seriously disordered behavior over an extended period of time which was adversely affecting his educational performance.  (Tr. 175-77).  A least restrictive environment statement said that Plaintiff continued to display inappropriate social interactions with peers and adults, that he was easily distracted, and that he had difficulty accepting responsibility for his actions.  (Tr. 184).  He also lacked respect for authority.  (Tr. 184).

Plaintiff has a history of marijuana dependence beginning when he was a teenager.  (Tr. 228).  He went to drug and alcohol rehabilitation in 2010 and graduated from the program.  (Tr. 228, 263).  From 2009 to 2010, Plaintiff saw his primary care physician, Dr. Mok, for a variety of reasons, including immunizations, lab work, and for completion of paperwork relating to Plaintiff's eligibility for Vocational Educational Services for Individuals with Disabilities ("VESID").  (Tr. 241, 244, 252, 259, 261-62).

Dr. Mok treated Plaintiff again on April 5, 2012.  (Tr. 246).  His eye was "still bothering him."  (Tr. 246).  Dr. Mok noted that Plaintiff could work only part time, that is 20-25 hours a week.  (Tr. 246).  She further noted that he could not stand, could not sit for more than two hours, and could not walk more than four hours total.  (Tr. 246).  She stated that Plaintiff had residual disability due to decreased strength in the left leg as compared with the right.  (Tr. 246).  She indicated that Plaintiff should continue with school and could work 25 hours with limited standing, sitting, walking, bending and

lifting. (Tr. 247). Plaintiff was also to wear eye protection and avoid heights and moving equipment. (Tr. 247).

At a July 10, 2012 visit to Dr. Mok, Plaintiff complained of left leg pain in his thigh which limited his ability to sit low and caused aching after walking. (Tr. 241). Dr. Mok found that Plaintiff had a closed fracture of his left femur, and ordered an x-ray of the left femur. (Tr. 242). Plaintiff also had retinal detachment, depression, and cataracts in his right eye. (Tr. 242; Tr. 268). Dr. Mok completed paperwork for Plaintiff's eligibility for VESID. (Tr. 241-42). She opined that Plaintiff should avoid standing for more than one hour, sitting for more than four hours, could do only limited bending, and could not work around heights or fast moving machinery. (Tr. 241-242, 268-270). On August 8, 2012, Richard White, D.O., a radiologist, noted that Plaintiff had a healed fracture of his left femur, and that the hardware in his left leg showed no evidence of loosening or other complications. (Tr. 224). He further found no evidence of left hip dislocation. (Tr. 224).

On August 8, 2012, Plaintiff also saw Christian Klein, M.D., who performed an ophthalmology examination. (Tr. 221). Dr. Klein noted that Plaintiff had a history of chronic retinal detachment of the right eye. (Tr. 221). Plaintiff also reported right eye pain occurring three to four times a month and photophobia (light sensitivity) in the left eye since 2007. (Tr. 221). Plaintiff had taken PredForte to treat his photophobia, but stopped taking it after a few weeks, as Plaintiff thought it caused eye discoloration and did not think it helped with his photophobia. (Tr. 221). Dr. Klein found Plaintiff had no light perception in his right eye, and  20/100 +1 and 20/50 -1 vision in his left eye. (Tr.

222).   Dr. Klein diagnosed Plaintiff with right eye pain in his blind right eye, and photophobia in the left eye.   (Tr. 222-223).   He offered Plaintiff PredForte and Atropine, but Plaintiff declined these medications at that time.   (Tr. 222).   Dr. Klein noted that the right phthisic eye may require removal in the future if the pain were to become intractable.   (Tr. 222).   He refrained from treating Plaintiff's photophobia, as he could find no clear etiology, and Plaintiff did not desire to use eye drops at that time.   (Tr. 223). Plaintiff was assessed with right eye pain in his blind eye status post chronic retinal detachment; photophobic left eye; and refractive error.   (Tr. 222-223).   Dr. Klein gave Plaintiff a prescription for eyeglasses, and instructed him to wear polycarbonate lenses at all times to protect his left eye.   (Tr. 223).

On October 3, 2012, Christine Ransom, Ph.D., a psychologist, performed a consultative psychological evaluation of Plaintiff.   (Tr. 227-230).   At the time of Dr. Ransom's evaluation, Plaintiff stated he was trying to attend a hospitality management program at Monroe Community College, but was having difficulty completing his studies.   (Tr. 228).   At the evaluation, Dr. Ransom observed that Plaintiff appeared unkempt with poor hygiene and personal grooming.   (Tr. 228).   Plaintiff's speech was slow and halting and his motor behavior was lethargic, but Dr. Ransom found his thought process was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia, though his eye contact was wandering.   (Tr. 228).   She found his affect was moderately dysphoric and moderately withdrawn.   (Tr. 228).   Dr. Ransom also noted that Plaintiff was receiving counseling for depression at Catholic Family Services.   (Tr. 227). Plaintiff reported having frequent crying spells, irritability, and low energy, though he

pushed himself to get things done. (Tr. 227). He said he had difficulty concentrating and that his mind wandered. (Tr. 227).

Dr. Ransom estimated that Plaintiff's intellectual functioning appeared to be in the borderline range with his general fund of information somewhat limited, though she did not administer IQ testing. (Tr. 229). She found Plaintiff's attention and concentration was moderately impaired by mood disturbance and limited intellectual capacity, and his insight and judgment were adequate as he was participating in treatment as recommended. (Tr. 229). Dr. Ransom also noted that Plaintiff could dress, bathe, and groom himself, and complete simple cooking, cleaning, laundry, and shopping. (Tr. 229). He could not manage money due to his limited intellectual capacity and he was not successful in completing school tasks. (Tr. 229).

Further, Dr. Ransom found Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple, regular schedule, and learn simple new tasks. (Tr. 229). She also noted that Plaintiff would have moderate difficulty performing complex tasks, relating adequately to others, and appropriately dealing with stress due to probable borderline intellectual functioning, and major depressive disorder which was moderate at that time. (Tr. 229-30). Dr. Ransom diagnosed Plaintiff with moderate major depressive disorder, marijuana dependence in remission, probable borderline intellectual functioning, and blindness in the right eye due to retinal detachment. (Tr. 230). She recommended that Plaintiff follow through with mental health treatment for depression. (Tr. 230). Dr. Ransom estimated that Plaintiff's prognosis related to his

depression was "fair to good with appropriate treatment." (Tr. 230). As for Plaintiff's limited intellectual capacity, Dr. Ransom estimated that Plaintiff's prognosis was "fair." (Tr. 230).

On October 3, 2012, Karl Eurenius, M.D., performed a consultative physical examination of Plaintiff. (Tr. 232-235). Plaintiff's chief complaints were blindness, depression, learning disability, and left leg pain. (Tr. 232). He also had progressive deterioration of his retina. (Tr. 232). Surgical procedures failed to preserve the retina in Plaintiff's right eye and he had become blind in that eye. (Tr. 232). At the time of the examination, Plaintiff reported that he was not taking medications. (Tr. 232). Vision testing showed Plaintiff had no vision in his right eye, and 20/100 vision in his left eye, which caused him difficulty with seeing faces. (Tr. 232-33). Dr. Eurenius noted Plaintiff was wearing sunglasses because every-day light caused pain in his left eye. (Tr. 233). Dr. Eurenius also found that Plaintiff had a normal gait, but walked somewhat slowly, probably due to his vision. (Tr. 233). He could only squat one quarter of a normal squat because of pain in his thigh. (Tr. 233). Plaintiff did not use an assistive device and needed no help in changing, getting off the table, or rising from a chair. (Tr. 233). Plaintiff had full flexion and extension of the cervical spine with some limited flexion in the lumbar spine. (Tr. 234). Dr. Eurenius noted that Plaintiff had a full range of motion in the shoulders, elbows, forearms, and wrists bilaterally. (Tr. 234). Plaintiff also had limited flexion in the left knee to 90 degrees. (Tr. 234). The examination further revealed that Plaintiff had 5/5 strength in the upper and lower extremities, no muscle atrophy, and 5/5 grip strength bilaterally. (Tr. 234). As for activities of daily living, Dr.

Eurenius noted that Plaintiff could make simple meals such as cereal and sandwiches, could clean when he had to, go shopping, and do laundry with help. (Tr. 233). Dr. Eurenius diagnosed Plaintiff with mental health issues to be evaluated elsewhere, blindness in the right eye, poor vision in the left eye, and status post left femur fracture with some limitation of left knee flexion and pain with ambulation. (Tr. 235). Dr. Eurenius stated that Plaintiff was limited in walking, particularly on uneven ground, and climbing due to left thigh pain. (Tr. 235). Plaintiff also was markedly limited in vision due to right eye blindness and poor vision in the left eye. (Tr. 235).

On December 23, 2012, David Morgan, a vocational rehabilitation counselor, completed an "Eligibility/Significance of Disability Case Note." (Tr. 274-277). Mr. Morgan noted that Plaintiff had a psychosocial impairment due to a mental illness, a visual impairment, and a cognitive impairment due to a specific learning disability. (Tr. 274). Plaintiff was receiving outpatient treatment for adjustment disorder with mixed disturbance of mood and conduct, and retinal detachment in his right eye. (Tr. 274). Further, Plaintiff's school records indicated that he functioned at a fifth-grade level in reading, spelling, and math. (Tr. 274).

Plaintiff had difficulty recalling visual and auditory information and sequences and school records indicated a history of impulsive and aggressive behavior. (Tr. 274). Mr. Morgan also found Plaintiff had limitations in communication, social and work interaction, initiative, judgment, work skills, and work tolerance. (Tr. 274-75). At the time, Plaintiff was struggling at Monroe Community College academically with significant tutoring support. (Tr. 274). He had difficulty following multiple directions,

oral or written directions, interpreting written materials and learning new tasks from written or verbal information, as well as reading job applications. (Tr. 274). Plaintiff also struggled to answer questions regarding personal history, to communicate through writing, and to repeat information. (Tr. 275). He lacked organization and focus. (Tr. 275). Additionally, Plaintiff had problems with social interaction which led to few or no support systems available, frequent upset or irritation, and impaired personal interactions because of overly aggressive behavior. (Tr. 275). He had trouble with work interactions as well which meant he had difficulty sustaining appropriate behavior for prolonged periods and used eye contact ineffectively. (Tr. 275). Regarding self-direction, Plaintiff had issues with following written instructions and judgment such that he did not consider alternatives, consequences of actions or dangerous activities, and had an unrealistic understanding of vocational capacities. (Tr. 275). Plaintiff had difficulty with work skills as well; he struggled to differentiate important from non-important information, generate strategies to problem solve, retain learned information for more than six months, perform calculations and had few transferable job skills. (Tr. 275). It was noted here that he read at a sixth grade level. (Tr. 275). Plaintiff also displayed restlessness, fidgeting, and agitation and did not pay attention to most important stimuli. (Tr. 275).

At the time, he had completed nine full semesters of school but had been unable to complete his associate degree in hospitality management. (Tr. 274). Mr. Morgan noted that for purposes of vocational rehabilitation services, Plaintiff met the "most significantly disabled criteria" due to three or more serious limitations. (Tr. 276). Thus,

Mr. Morgan found Plaintiff eligible for multiple rehabilitation services to reduce the impact of Plaintiff's limitations on employment for six months or longer. (Tr. 276-77).

From September 2012 to July 2013, Plaintiff attended counseling at the Catholic Family Mental Health Clinic. (Tr. 278-335). On September 7, 2012, Eileen Roach, an evaluator with the Catholic Family Mental Health Clinic, performed a comprehensive evaluation of Plaintiff. (Tr. 278). Plaintiff presented with a depressed mood and expressed negative thinking as he ruminated over his physical limitations and over the activities and goals he could not pursue due to his limitations. (Tr. 278). He reported he was in his last semester at Monroe Community College and was struggling. (Tr. 278).

Plaintiff's mental status examination revealed poor eye contact, guarded demeanor, depressed mood, blunted affect, racing thoughts, and slowed, soft, unclear, mumbled speech. (Tr. 279). His impulse control by recent history was poor, though during the evaluation it was good, he was unable to concentrate, and he had difficulty with his temper. (Tr. 280). He also had a decreased appetite. (Tr. 280).

Plaintiff told Ms. Roach that, despite his struggles, he enjoyed school and was looking forward to finishing his program. (Tr. 291). Ms. Roach diagnosed Plaintiff with adjustment disorder with mixed disturbance of emotions and conduct. (Tr. 289). Ms. Roach recommended weekly individual counseling sessions until Plaintiff could exhibit impulse control and his symptoms of depressed mood subsided. (Tr. 293).

At Plaintiff's first few individual counseling sessions in September 2012, Plaintiff reported his mood as depressed. (Tr. 301, 302, 306). During his September 14, 2012 session, his speech started off low and mumbled but became more clear. (Tr. 303). His

judgment and impulse control was fair "at best." (Tr. 303). During his September 21, 2012 session, his affect was blunted, not labile and inappropriate to content. (Tr. 304). During Plaintiff's September 28, 2012 session, his affect was not appropriate to content, he reported his mood as depressed and appeared sullen, but he smiled and appeared "excited" as he talked about being jumped on the streets as a teenager. (Tr. 306).

On October 5, 2012, his affect continued to be inappropriate to content and his mood was irritable. (Tr. 309). On October 12, 2012, his mood was sullen and his affect was not labile, appropriate to content, and blunted. (Tr. 308). His speech was barely audible and slow. (Tr. 308). He also showed decreased activity in movements and gestures. (Tr. 308). On October 19, 2012, Ms. Roach noted that Plaintiff's affect was slightly blunted, not labile and appropriate to content. (Tr. 312). Plaintiff reported he had lost 20 pounds the previous week resulting from stress, fatigue, and depression, but also stated that he felt happy, loved, proud, and tired. (Tr. 312). Ms. Roach also noted that Plaintiff showed progress as his insight and judgment were improving slowly, he avoided physical altercations, and displayed an improvement in mood. (Tr. 312-313). On October 26, 2012, Plaintiff felt disappointed from withdrawing from a class, which pushed his graduation date back. (Tr. 314). His affect was blunted, not labile, and appropriate to content. (Tr. 314).

During a November 2, 2012 counseling session, Plaintiff reported that he enjoyed college life and was seeking employment. (Tr. 316). His judgment and insight remained fair. (Tr. 316). As of November 9, 2012, his impulse control, judgment and insight had slightly improved. (Tr. 318). Plaintiff reported having visited his family in New Jersey

-14-

to support them after the blackout from Hurricane Sandy. (Tr. 318). On November 16, 2012, Plaintiff's speech was soft, his mood was tense and downtrodden, his affect was blunted, not labile, and inappropriate to content, and he was pleasant and made appropriate eye contact. (Tr. 320). He reported feeling better than when he had started counseling, but still recognized his limits "at the end of the day." (Tr. 320). On November 30, 2016, Plaintiff noted a decrease in his use of profanity. (Tr. 322). On December 7, 2012, it was noted that Plaintiff, despite his limitations, was still able to complete his school work and be a father. (Tr. 324).

On January 18, 2013, Plaintiff began therapy with Leticia Alston. (Tr. 325). She noted that his mood was angry and depressed. (Tr. 325). Plaintiff wore dark glasses and reported that he did not like the way he looked and that he would scare himself when he looked in the mirror. (Tr. 325). He stated that he could not get a good job wearing glasses and also reported an unknown learning disability. (Tr. 325). He said he becomes depressed as his physical health limits what he wants to do, particularly sports. (Tr. 325)

Plaintiff reported struggling with anger management on February 1, 2013. (Tr. 327). He also appeared to be smiling as he recounted stories of physical altercations he had been involved in. (Tr. 327). On March 1, 2013, Plaintiff indicated frustration at not being able to find an internship placement, though he also indicated that his depressive symptoms had lessened. (Tr. 328). Plaintiff expressed frustration about school on March 15, 2016. (Tr. 329). He said that he felt like giving up school. (Tr. 329).

By April 2013, counseling progress notes show Plaintiff's depressive symptoms had decreased. (Tr. 331). Particularly, he stated he was not allowing a particular

personal situation to become stressful because he did not want anything to get in the way of his graduation from Monroe Community College. (Tr. 331-332). Ms. Alston treated Plaintiff on May 24, 2013 and Plaintiff reported experiencing less agitation and improved peer relationships in the school setting. (Tr. 333). On July 12, 2013, Plaintiff relayed continued depressive symptoms in relation to his eye, which was permanently lost. (Tr. 334). He also reported struggling with memory loss. (Tr. 334). On July 22, 2013, he stated that he was working toward a second associate degree and that he continued to manage his symptoms in an effort to pursue his educational goal. (Tr. 335).

Dr. Mok treated Plaintiff on January 10, 2013 for retinal detachment. (Tr. 238). His depression was moderately severe. (Tr. 238). Dr. Mok assessed him with both retinal detachment and closed fracture of the femur. (Tr. 239). She noted that he could work full time with the limitations of walking less than one hour, standing less than 30 minutes, sitting three hours, limited bending, no squatting, and limited sitting. (Tr. 239). She also referenced a DSS form. (Tr. 239). Visual testing showed 20/100 vision in his left eye without corrective lenses. (Tr. 239).

## III.   Discussion

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.,* No. 12 Civ.

6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)).  42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record.  Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y., Inc. v. NLRB*, 305 U.S. 197, 229 (1938).  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ).  If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46-47 (2d Cir.1996).

Judgment on the pleadings may be granted under Fed. R. Civ. P. 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

### B.    Determining Disability Under the Social Security Act

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin,* No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014).   A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The burden is on the claimant to demonstrate that she is disabled within the meaning of the Act.  *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir. 2002).  The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis.  If the ALJ makes a determination at any step, the evaluation will not continue to the next step.  20 C.F.R. § 416.920(a)(4).  The following five steps are followed:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.     If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.     If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.     If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.     If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

C.     **Summary of the ALJ's Determination**

In applying the five-step sequential evaluation in this matter, ALJ Begley made the following determinations.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 13, 2012, the application date.  (Tr. 15).  At step two, he determined that Plaintiff had severe impairments of right eye blindness, status post remote left femur fracture and repair, and major depressive disorder.  (Tr. 15).  The ALJ concluded at step three that Plaintiff did not meet or equal any listed impairment.  (Tr. 15).  At step four, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and found that Plaintiff:

[H]as the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: prohibited from climbing ladders, ropes, and scaffolds; occasional climbing of ramps and stairs, balancing, stooping,

-19-

kneeling, crouching, and crawling; avoid slippery and uneven surfaces, hazardous machinery, and unprotected heights; limited to simple, routine, and repetitive tasks; and limited to jobs that do not require peripheral acuity or working with small objects, small print, or objects that require fine visual acuity.

(Tr. 17).  The ALJ also determined at step four that Plaintiff has no past relevant work.  (Tr. 20).  At step five, the ALJ ultimately concluded that Plaintiff was not disabled or entitled to disability insurance benefits.  (Tr. 20-21).

### D.   Plaintiff's Objections

#### 1.   Arguments

##### a)   The ALJ's Evaluation of Plaintiff's Diminished Intellectual Capacity

Plaintiff argues that the ALJ erred in not evaluating the severity of Plaintiff's alleged-borderline intellectual functioning because there was substantial evidence supporting Plaintiff's inability to work in the national economy as a result of that impairment.  (Dkt. 13-1 at 14).  Plaintiff points to three pieces of such evidence.

First, the consultative physician, Dr. Ransom, diagnosed Plaintiff with probable borderline intellectual functioning despite having no access to Plaintiff's IQ scores, and noted that it impaired his attention, concentration and immediate memory.  (Dkt. 13-1 at 14, 16-17).  She also noted that he had a moderate limitation in relating adequately to others and dealing with stress.  (Dkt. 13-1 at 17).  Second, Plaintiff highlights vocational rehabilitation counselor David Morgan's diagnosis of cognitive impairment, limiting his ability to work.  (Dkt. 13-1 at 14-15, 17).  Mr. Morgan also indicated Plaintiff's reading level was that of a fifth grader and noted Plaintiff's difficulty with visual and auditory

information, sequences, receptive language, expressive communication, initiative, judgment, and work skills due in part to his cognitive problems. (Dkt. 13-1 at 17). Plaintiff had been unable to complete his associate degree within nine semesters. *Id.* Additionally, Mr. Morgan found that Plaintiff met VESID's "most significantly disabled" criteria resulting from three or more serious limitations requiring multiple rehabilitation services. (Dkt. 13-1 at 17). Third, Plaintiff points to Plaintiff's childhood full scale IQ score of 83, which is within the borderline intellectual functioning range. (Dkt. 13-1 at 15-17).

According to Plaintiff, the ALJ erred by not assessing the above information at step two of his analysis, and instead dismissing the potential impairment by saying in the RFC assessment that the record as a whole did not support a finding of borderline intellectual functioning or that Plaintiff would not be able to adequately relate to others or deal with stress appropriately. (Dkt. 13-1 at 14-15, 17-18). Plaintiff contends that this is factually incorrect in light of Plaintiff's IQ scores and Mr. Morgan's assessments. (Dkt. 13-1 at 18). Plaintiff comments that the error in rejecting the finding that Plaintiff would have difficulty appropriately dealing with stress was particularly harmful because, when presented with a hypothetical in which a common stress limitation was posited, the VE said there were no jobs in the national economy for Plaintiff. (Dkt. 13-1 at 18). Removing the stress limitation thus led to a subsequent error at step five in finding that there was appropriate work for Plaintiff in the national economy. (Dkt. 13-1 at 18-19).

Defendant counters that Plaintiff failed to demonstrate how Plaintiff's alleged probable borderline intellectual functioning caused limitations that precluded him from

engaging in substantial gainful activity. (Dkt. 16-1 at 12-13). First, Dr. Ransom only estimated Plaintiff's intellectual capacity — she neither administered an IQ test nor definitively diagnosed him. (Dkt. 16-1 at 13). Defendant contends that the diagnosis of probable borderline intellectual functioning is speculative. *Id.* Dr. Ransom also opined that Plaintiff was able to do a variety of basic work activities such as following and understanding simple instructions, performing simple tasks, maintaining a simple and regular schedule, and learning simple new tasks. *Id.* Based on this, Defendant submits that, even with probable borderline intellectual functioning, his impairment was not severe. *Id.*

Defendant argues that Plaintiff's reliance on a childhood IQ score in a school psychologist's statement is misplaced as the school psychologist concluded that even despite Plaintiff's IQ, he was able to function in the low average range rather than the borderline range. (Dkt. 16-1 at 14). Defendant urges that child IQ scores are not necessarily representative of potential since Plaintiff was able to attend school for associate degrees. *Id.*

Defendant further combats Plaintiff's reliance on the opinion of vocational rehabilitation counselor Mr. Morgan because he is considered an "other source" rather than an acceptable medical source. *Id.* Because an ALJ can consider the length of the relationship with Plaintiff, the consistency of the opinion with the record, and to what extent relevant evidence supports the opinion when evaluating an "other source," Defendant argues that there is no evidence of a treating relationship, that an assessment of a sixth-grade reading level is inconsistent with the evidence that shows Plaintiff able to

attend college and Mr. Morgan's opinion fails to support a claim of severe borderline intellectual functioning. (Dkt. 16-1 at 14-15).

Defendant also credits the ALJ's decision to grant little weight to Dr. Ransom's opinion that Plaintiff had moderate limitations in relating to others and dealing with stress appropriately by noting Plaintiff's improvement in counseling after the date of Dr. Ransom's evaluation. (Dkt. 16-1 at 16). Defendant contends that Plaintiff's ability to attend college and earn a degree also directly contradicted Dr. Ransom's finding. *Id.*

In light of the above discrediting of severity regarding intellectual capacity and ability to deal with others and stress, Defendant argues that Plaintiff cannot rely on what a VE would have said had the former and latter circumstances been present. (Dkt. 16-1 at 17).

Plaintiff briefly replies that, despite a non-definitive diagnosis of borderline intellectual functioning, the C.F.R. assesses borderline intellectual functioning with a review of intelligence tests, development history, and degree of functional limitation. (Dkt. 17 at 2). That Plaintiff had an IQ of 83, was assessed with moderately limited attention, concentration, and immediate memory partly because of limited intellectual capacity and probable borderline intellectual functioning shows functional limitation. (Dkt. 17 at 2). Finally, Plaintiff asserts that Plaintiff's attendance at community college does not mitigate any of the above issues because he struggled so severely academically. (Dkt. 17 at 2-3).

### (1)      Legal Standard

Step two of the disability evaluation, the severity determination, is intended to "increase[] the efficiency and reliability of the [disability] evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). The severity determination is governed by the severity regulation:

> You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

20 C.F.R. §§ 404.1520(c), 416.920(c). The regulations define the ability to do basic work activities as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§404.1521(b), 416.921(b). Examples of the above include: "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." *Id.*

"An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." 42 U.S.C. § 423(d)(5)(A). "If a claimant is unable to show that he has a medically severe impairment, he is not eligible for disability benefits. In such a case there is no reason for the [Commissioner] to consider the claimant's age, education,

and work experience." *Bowen*, 482 U.S. at 148.  Thus, "[t]he claimant bears the burden of presenting evidence establishing severity." *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (hereinafter "*Taylor*").

While the Second Circuit has held that the severity regulation is "valid only if applied to screen out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), "the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Taylor*, 32 F. Supp. 3d at 265.  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting SSR 85-28, 1985 WL 56856, at *3, quoted in *Bowen*, 482 U.S. at 154 n.12).

"When [the Social Security Administration (the "SSA")] evaluate[s] the severity of mental impairments for adults . . . [the SSA] must follow a special technique at each level in the administrative review process." 20 C.F.R. § 404.1520a(a).  The technique, summarized in the footnote below, helps ALJs determine whether claimants have medically-determinable mental impairments and whether any such impairments are severe at step two.[1]  *Showers v. Colvin*, No. 3:13-cv-1147 (GLS/ESH), 2015 WL

---

[1]    As explained in *Showers v. Colvin*, No. 3:13-cv-1147 (GLS/ESH), 2015 WL 1383819 (N.D.N.Y. Mar. 15, 2015):

> Administrative law judges first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).

1383819, at *4 (N.D.N.Y. Mar. 25, 2015).   "The regulations also require that the application of the special technique be documented. . . .   The ALJ's written decision must 'reflect application of the technique, and . . . "include a specific finding as to the degree of limitation in each of the [four] functional areas."'" *Kennerson v. Astrue*, No. 10-CV-6591 (MAT), 2012 WL 3204055, at *14 (W.D.N.Y. Aug. 3, 2012) (citing *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008 ) (citing 20 C.F.R. § 404.1520a(e)).

Courts have held that error at step two in determining the severity of impairments is harmless if the ALJ finds at least one other severe impairment and continues through the sequence of the disability analysis because the non-severe impairments can later be considered at the RFC stage. *See, e.g., Taylor*, 32 F. Supp. at 267 ("[E]ven if the ALJ

---

> Next, they must assess the degree of functional limitation (*Id.*, §§ 404.1520a(b)([2]), 416.920a(b)(2)), *i.e.*, the degree to which claimants' impairments functionally limit their "ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*, at §§ 404.1520a(c)(2), 416.920a(c)(2). To complete this assessment, they must "rate the degree of functional limitation" in four areas: (1) "[a]ctivities of daily living;" (2) "social functioning;" (3) "concentration, persistence, or pace;" and (4) "episodes of decompensation." *Id.*, at §§ 404.1520a(c)(3), 416.920a(c)(3).
>
> For the first three areas, administrative judges provide ratings of "[n]one, mild, moderate, marked, [or] extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). For the fourth, they provide ratings on a four-point scale: "[n]one, one or two, three, four or more." *Id.* They generally conclude that mental impairments are not severe when claimants receive a rating of "none" or "mild" in each of the first three areas and "none" in the fourth area. *Id.*, at §§ 404.1520a(d)(1), 416.920a(d)(1); *Kohler*, 546 F .3d at 266.

*Id.* at *4 n.11.

erred in finding these conditions (or any of Plaintiff's other impairments) non-severe, any

such error(s) was harmless because the ALJ concluded that Plaintiff had established other

impairments considered severe under the Act . . . and continued with the sequential

disability analysis.") (citing *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240,

244 (6th Cir. 1987) ("[T]he Secretary found that Maziarz suffered from the severe

impairment of coronary artery disease, status post right coronary artery angioplasty and

angina pectoris.  Accordingly, the Secretary continued with the remaining steps in his

disability determination.  Since the Secretary properly could consider claimant's cervical

condition in determining whether claimant retained sufficient residual functional capacity

to allow him to perform substantial gainful activity, the Secretary's failure to find that

claimant's cervical condition constituted a severe impairment could not constitute

reversible error."); *McCartney v. Comm'r of Soc. Sec.*, No. 07-1572, 2009 WL 1323578,

at *16 (W.D. Pa. May 8, 2009) ("Even if the Court was to find that the ALJ did err in

excluding headaches from the list of severe impairments, any such error was harmless

because the ALJ found other severe impairments at step two and proceeded through the

sequential evaluation on the basis of Plaintiff's severe and non-severe impairments.")); 

*Simcox v. Colvin*, No. 1:14-CV-00787 (MAT), 2016 WL 228359, at *3 (W.D.N.Y. Jan.

19, 2016) ("To the extent the ALJ erred in finding these impairments to be non-severe,

that error was harmless 'because the ALJ concluded that [p]laintiff had established other

impairments considered severe under the Act . . . and continued with the sequential

disability analysis.'" (quoting *Taylor*, 32 F. Supp. 3d at 267)).  "As a general matter, an

error in an 'ALJ's severity assessment with regard to a given impairment is harmless . . .

"when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or her ability to work during the balance of the sequential evaluation process."'" *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 311-12 (W.D.N.Y. 2013) (citations omitted); *see also Reices-Colon v. Astrue*, 523 Fed. App'x 796, 798 (2d Cir. 2013) (holding an ALJ's exclusion of two impairments from his step two review was harmless error "[b]ecause these conditions were considered during the subsequent steps").

Despite this harmless error doctrine, there is case law to suggest that it does not always apply, especially in relation to a mental impairment.  Indeed, "[c]ourts have held that the failure to apply the special technique is not harmless error." *Kennerson*, 2012 WL 3204055, at *15 (citing *Moore v. Astrue*, No. 3:10-CV-0709 (CFD)(TPS), 2010 WL 4976756 (D. Conn. Dec. 2, 2010)); *see also Taylor v. Astrue*, No. 6:11-cv-588 (GLS), 2012 WL 1415410, at *2 (N.D.N.Y. Apr. 24, 2012) ("The ALJ's error in [merely paying lip service to the special technique and not providing details in support of his findings] requires remand inasmuch as the court cannot meaningfully review the determination."). "Unless the ALJ has performed the [special technique] analysis, he or she has not adequately considered the entire record when determining the severity of the claimant's impairments." *Kennerson*, 2012 WL 3204055, at *14 (citing *Kohler*, 546 F.3d at 268). This is because "it is not sufficient to discuss the [functional] limitations in the context of claimant's residual functional capacity," thus the ALJ must "make specific findings regarding claimant's degree of limitation in each [of the four] functional area[s]." *Id.* (citing *Moore*, 2010 WL 4976756, at *3 (citing *Kohler*, 546. F.3d at 268)); *see also Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007) (holding the ALJ's failure to analyze the

plaintiff's borderline intellectual functioning under the special technique was in error even where other impairments were found to be severe at step two); *Moore*, 2010 WL 4976756, at *3 (rejecting as without merit the Commissioner's argument that, because plaintiff's claim as a whole made it past the screening step, details of the ALJ's analysis of the plaintiff's psychiatric impairments at step two were not particularly significant.).

However, the above line of legal thought is not undisputed. *See Showers*, 2015 WL 1383819, at *6 (finding that the omission of performing the special technique to determine whether the plaintiff's mental disorders rose to the level of medically-determinable abnormalities was not, by itself, reversible error when the ALJ discussed at least some examination findings and concluded that no objective findings supported diagnoses of the mental impairments); *Pokluda v. Colvin*, No. 1:13-cv-335(GLS/ESH), 2014 WL 1679801, at *10 (N.D.N.Y. Apr. 28, 2014) ("[L]ack of a severe mental impairment finding is of no particular significance here.  [The ALJ] found that other disorders . . . constitute severe impairments, and then conducted a full, 5-step sequential analysis."); *Booker v. Astrue*, No. 1:07-cv-646 (GLS), 2011 WL 3735808, at *3-4 (N.D.N.Y. Aug. 24, 2011) (finding that, although the ALJ's severity determination of a mental impairment was suspect as he did not apply the special technique specifically at the severity determination stage, "[u]ncertainty at [that] stage [did] not, standing alone, warrant remand or reversal if the ALJ's other findings [showed] that proper legal standards were applied and that all of the plaintiff's impairments were properly considered at all of the subsequent steps").

### (2)    Application

Here, ALJ Begley did not address Plaintiff's alleged-borderline intellectual functioning impairment at step two or step three of the disability analysis.   Even assuming this omission would constitute harmless error because the ALJ found other severe impairments at step two and proceeded with the sequential assessment, the Court cannot say that the ALJ properly assessed a combination of Plaintiff's impairments, severe and non-severe, during the remaining steps.  *See Booker*, 2011 WL 3735808, at *4 (The "ALJ's other findings [must] show that the proper legal standards were applied and that all of [the plaintiff's] impairments were properly considered at all of the subsequent steps.").  As discussed below, the ALJ erred in not adequately considering Mr. Morgan's assessment of Plaintiff, which included relevant information regarding limitations from Plaintiff's alleged-borderline intellectual functioning impairment.  (*See* Part III.D.1.b.2 of this Decision and Order).

The ALJ made another error that the Court notes *sua sponte* to provide guidance on remand.  *See Maldonado v. Comm'r of Soc. Sec.*, No. 12-CV-5297 (JO), 2014 WL 537564, at *17 (E.D.N.Y. Feb. 10, 2014).  He should have performed and documented the special technique with regard to Plaintiff's alleged-borderline intellectual functioning impairment in compliance with regulation 20 C.F.R. § 404.1520a.  Though he did, as part of his step three analysis,  perform the second step of the special technique in assessing the degree of functional limitation in each of the four areas of activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation, this assessment was in relation to Plaintiff's depression, not his alleged-borderline

intellectual functioning.[2]   20 C.F.R. § 404.1520a(c)(3); (Tr. 15-17).   While the ALJ's functional limitation assessment for Plaintiff's depression could, in theory, draw from the same sources in the record and be substantially similar to that which the ALJ would have assessed for Plaintiff's alleged-borderline intellectual functioning, it would be overly speculative on the part of the Court to say as much definitively.   And even if the functional limitations for depression could be applied to Plaintiff's alleged-borderline intellectual functioning, the ALJ still did not perform the threshold analysis of the special technique of specifying symptoms, signs, and laboratory findings to substantiate the presence of a medically determinable mental impairment and document those findings. 20 C.F.R. § 404.1520a(b)(1); 20 C.F.R. § 404.1520a(e)(4).   On remand, the ALJ should apply the special technique at both steps two and three to both of Plaintiff's alleged impairments of depression and borderline intellectual functioning.

Accordingly, the Court need not reach the issue of whether the ALJ assigning little weight to Dr. Ransom's assessment of Plaintiff's ability to deal with stress and relate with others was in error, resulting in a faulty RFC.

---

[2]      The ALJ somewhat vaguely refers to his analysis in step three as that of Plaintiff's "mental impairment." (Tr. 15).  He mentions, though, that the analysis was done under the rubric of "the criteria of listing 12.04." (Tr. 15).  Listing 12.04 in 20 C.F.R. Part 404, Subpart, P, Appendix 1 deals with "[a]ffective disorders [] [c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." The Court deduces from this that the ALJ was dealing only with Plaintiff's depressive disorder at this stage of the sequential analysis.

### b)    The ALJ's Evaluation of the Opinion of Vocational Rehabilitation Counselor Davis Morgan

Plaintiff argues second that the ALJ's failure to evaluate the assessment of vocational rehabilitation counselor David Morgan in any way was in error. (Dkt. 13-1 at 19). Despite Mr. Morgan's status as not an "acceptable medical source," but as an "other source," Plaintiff argues that Mr. Morgan's opinion should have at least been evaluated and assigned a weight. (Dkt. 13-1 at 20). The ALJ's silence, Plaintiff submits, "leaves this Court with no ability to meaningfully review whether the ALJ properly assessed this evidence." (Dkt. 13-1 at 20). Mr. Morgan's assessment identified a number of areas in which Plaintiff had functional limitations due to his various impairments and concluded that he was "most significantly disabled," which undercut the ALJ's RFC of Plaintiff's ability to perform simple and repetitive work. (Dkt. 13-1 at 19, 21).

Defendant counters that the ALJ's decision makes clear that he did not wholly ignore Mr. Morgan's opinion because he mentioned that Plaintiff received vocational and educational rehabilitation services. (Dkt. 16-1 at 18). Defendant asserts that, as long as an ALJ clearly considers an "other source" assessment, he did not err. (Dkt. 16-1 at 18). Defendant bolsters this argument by noting that the ALJ said that he considered all of the evidence. (Dkt. 16-1 at 18-19). Defendant also highlights that, despite Mr. Morgan's assessment of Plaintiff as "most significantly disabled," the disability determination is left to the Commissioner alone. (Dkt. 16-1 at 19). Finally, Defendant argues that Mr. Morgan's opinion is inconsistent with the record as a whole. (Dkt. 16-1 at 19).

Plaintiff replies that Defendant's representation that the ALJ mentioned Plaintiff's receipt of vocational and educational rehabilitation services in his RFC is incorrect and that the ALJ only refers to "special accommodations" in school, and this does not amount to an implicit reference to Mr. Morgan's assessment. (Dkt. 17 at 4). Thus, according to Plaintiff, there is no evidence that the ALJ considered Mr. Morgan's opinion at all. The remainder of Defendant's argument, Plaintiff claims, is a post-hoc rationalization of the analysis the ALJ himself did not perform, which is inappropriate. (Dkt. 17 at 4). In sum, Plaintiff urges that Mr. Morgan's assessment addresses issues pertinent to Plaintiff's alleged-borderline intellectual functioning and the ALJ should have at least considered these assessments before succinctly dismissing the alleged impairment. (Dkt. 17 at 5).

### (1)    Legal Standard

An ALJ "will assess [the plaintiff's] residual functional capacity based on all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3)-(4), 416.945(a)(3)-(4). Additionally the RFC determination "must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). In evaluating whether a Plaintiff has a medically determinable impairment, an ALJ must consider evidence from "acceptable medical sources," which includes physicians, psychologists, optometrists, podiatrists and speech pathologists. *See* 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5). The regulations also provide that the ALJ "may also use evidence from other sources to show the severity of [the plaintiff's] impairment(s) and how it affects [his or her] ability to work." 20 C.F.R. §§ 404.1513(d),

416.913(d).  "Other sources" include, but are not limited to other medical sources not listed above, educational personnel, public and private social welfare agency personnel, and other non-medical sources.  *See* 20 C.F.R. § 404.1513(d)(1)-(4), 416.913(d)(1)-(4).

An ALJ should use "essentially the same factors in evaluating the opinions of . . . 'other sources' as are used to evaluate the opinions of 'acceptable medical sources.'"[3] *Oaks v. Colvin*, No. 13-CV-917-JTC, 2014 WL 5782486, at *7 (W.D.N.Y. Nov. 6, 2014).

Additionally:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 WL 2329939, at *6.  Thus, "'[w]hile the Commissioner is . . . free to decide that the opinions of "other sources" . . . are entitled to no weight or little weight, those decisions should be explained.'"  *Oaks*, 2014 WL 5782486, at *8 (citing *Sears v. Astrue*, No. 2:11-CV-138, 2012 WL 1758843, at *3) (D. Vt. May 15, 2012)); *see, e.g., Colon v. Astrue*, No. 11-CV-210A, 2013 WL 2245457, at *11 (W.D.N.Y. May 21, 2013) ("It was an abuse of discretion for [the ALJ] to entirely ignore [the vocational rehabilitation counselor's evidence].").

---

[3]     These factors include the examining relationship, treatment relationship including length of treatment relationship and nature and extent of treatment relationship, supportability, consistency, specialization, and other factors.  *See* 20 C.F.R. § 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

(2)     **Application**

It is far from clear in the case at bar whether the ALJ considered Mr. Morgan's assessment and, if considered, the ALJ certainly did not explain the weight he assigned to the assessment.   Defendant does not argue the legal standard, instead opting to proffer that it is implicitly clear the ALJ considered Mr. Morgan's assessment by acknowledging in his decision that Plaintiff received vocational and educational rehabilitation services. (Dkt. 16-1 at 18).   However, the Court agrees with Plaintiff that this representation is incorrect.   The ALJ stated, at the cited spot: "[Plaintiff] receives special accommodations that include enlarged handouts and extra time to take tests."  (Tr. 17).  The Court cannot read this as a reference to Mr. Morgan or vocational rehabilitation in any way. Additionally, although the ALJ asked at the hearing "did you receive services or did you go to vocational rehabilitation or VESID," this is not evidence that the ALJ considered Mr. Morgan's written assessment in issuing his decision.  (Tr. 45-46).

Even if the ALJ did consider Mr. Morgan's assessment in issuing his decision, without his reasoning for assigning the assessment presumably little weight,[4] the Court cannot effectively decide whether the determination is supported by substantial evidence. Thus, the ALJ's omission with regard to Mr. Morgan's evidence was in error.

IV.    **Conclusion**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 16) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 13)

---

[4]     The Court presumes the ALJ would have assigned Mr. Morgan's assessment little weight because many of Mr. Morgan's assessments would cut against an RFC of "simple, routine, and repetitive tasks."  (Tr. 17, 274-75).

is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  August 25, 2016
          Rochester, New York